IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs April 29, 2020

**STATE OF TENNESSEE v. MARQUAIL PATTERSON**

**Appeal from the Criminal Court for Knox County**
**No. 104173   Bobby R. McGee, Judge**

_____

**No. E2019-01139-CCA-R3-CD**

_____

Marquail Patterson, Defendant, was found guilty by a jury of unlawful possession of a handgun, second degree murder, and five counts of attempted reckless endangerment after a shooting at Studio X in Knoxville in the summer of 2014 during which one person was killed and five people were injured.  Defendant received an effective sentence of thirty years in incarceration to be served at 100%.  In this delayed appeal, Defendant argues that the evidence was insufficient to support the convictions.  After a review, we affirm the judgments of the trial court with respect to Defendant's convictions for unlawful possession of a handgun and second degree murder.  However, we vacate Defendant's convictions for attempted reckless endangerment because Defendant was convicted of a crime which does not exist.  Therefore, those convictions are void.  Consequently, the judgments of the trial court are affirmed in part, vacated in part, and remanded.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**
**in Part and Vacated in Part and Remanded**

TIMOTHY L. EASTER, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and J. ROSS DYER, JJ., joined.

Gerald L. Gulley, Jr. (on appeal), and Scott Lanzon (at trial), Knoxville, Tennessee, for the appellant, Marquail Patterson.

Herbert H. Slatery III, Attorney General and Reporter; David H. Findley, Senior Assistant Attorney General; Charme P. Allen, District Attorney General; and Ta Kisha Fitzgerald, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

A 911 call came in on July the 26th of 2014 at 2:59 a.m., reporting a shooting at Studio X in Knoxville, on "the strip" near the University of Tennessee. Officer Todd MacFaun of the Knoxville Police Department was nearby at a gas station investigating a kidnapping. Officer Jeff Algood and Sergeant Davis[1] were also on the scene at the gas station with Officer MacFaun. While questioning a female at the gas station scene, officers heard shots fired from the east. The officers took off running toward the sound of the shots being fired. Officer Algood estimated that there were "40 to 60 people running" away from Studio X. Officer MacFaun confirmed people in a "massive crowd" were "yelling out the description of the shooter. And at that point, [witnesses] said there was a red shirt running north on 20th." Officer MacFaun called in the description of the shooter on the radio as a man wearing a red shirt and continued to run up the hill toward the scene. The officers observed two males wearing red shirts in the vicinity of the club. Officer MacFaun got one of the suspects to the ground and waited for backup. This person was later identified as Clay Coats. Defendant was apprehended to the south of Officer MacFaun's location by Sergeant Davis. Both of the men were transported to the police station. On the way to the station, Defendant asked if he had to go to the station "[b]ecause [he] had on the same shirt someone else had on." Once the men arrived at the station, Officer McFaun described Mr. Coats as "nervous" and "afraid," while Defendant was described as "nonchalant," even falling asleep at one point while he was detained.

Investigator A.J. Loeffler of the violent crimes unit responded to the scene the night of the shooting. He later interviewed Defendant at the police station. Defendant "stated that there was a shooting, doesn't know anyone that was involved, doesn't know what happened." He also interviewed Sparkle Jones, Defendant's girlfriend, who was with Defendant that night.

During the investigation of the incident, Investigator Loeffler retrieved video surveillance footage from a nearby business called "The Loft." The security camera was pointed toward Studio X and showed a clear view of the courtyard outside the club where the shooting took place. According to Investigator Loeffler, the video "show[ed] . . . the shooting that occurred." In the video, Adarius Boatwright, the victim, was "standing in the middle of the courtyard," and appeared to be talking to people nearby. He continued:

> [Defendant] walks towards him. At some point, Ms. Jones gets between them. At that point, Mr. Boatwright's still standing there. He has his hands behind his back. Ms. Sparkle - - or Ms. Jones, appears that she's pushing [Defendant] away from Mr. Boatwright. As he is stepping back away, Mr. Boatwright just turns and faces him, hands still behind his back,

---

[1] Again, Sergeant Davis's first name does not appear in the record.

and as [Defendant] takes a step back, [Defendant] pulls out a gun, points it at [the victim], starts shooting.

At that time, Mr. Boatwright started to fall. Defendant moved toward him and continued to shoot as Mr. Boatwright fell to the ground.

Another surveillance video showed Defendant after the shooting. Once Defendant stopped shooting, he turned and walked away. He started moving faster. Mr. Coats was also seen on this video. Mr. Coats ran eastbound on Cumberland and Defendant "turn[ed] the corner up that street next to Stefano's [Pizza] and start[ed] running up that street."

A Glock 27 was found near the crime scene. It was equipped with a large capacity magazine that would allow the gun to hold 22 bullets. Terra Asbury of the Tennessee Bureau of Investigation confirmed that swabs from the Glock 27 found near the crime scene contained a mixture of genetic material from at least two individuals. The "major contributor" matched Defendant. Eight fired .40 caliber cartridge cases which were recovered from the scene were fired from the Glock 27.

Mr. Boatwright sustained five gunshot wounds, all of which entered the body through the back. He died from his injuries.

Marking Vaughn came to Knoxville from Chattanooga that night to "hang out with a couple of friends" at Studio X, a "club slash bar" where alcohol was sold and consumed. At one point, he stepped out on the patio to smoke and was "talking to these guys" about riding motorcycles. "All the sudden [he] heard gunshots." Instead of "hit[ting] the floor" he tried to get back inside the club. He was hit by a bullet and "collapsed inside the club." He was shot in the back on his left side. Mr. Vaughn heard "seven or eight" shots. An unknown woman helped him before an ambulance arrived and transported him to the hospital in Knoxville. Mr. Vaughn also went to the hospital when he got back to Chattanooga. The bullet was eventually removed from his back. Mr. Vaughn was out of work for two or three months after the shooting. Mr. Vaughn did not recognize Defendant at trial.

Joshua Wilkerson was "hang[ing] out with [his] family" at Studio X at the time of the incident. He went there to "party" with "a lot of his family." He saw the victim at Studio X with a group of about five people. Shortly after Mr. Wilkerson walked outside, he "heard the first gunshot and [he] took off to [his] left." He was "hit in both [of his] legs" but kept running. He "jumped the gate" and told someone near him that he had been shot. Someone from the Tin Roof bar next door carried him about ten feet and laid him down. Mr. Wilkerson did not remember anything until the next morning when he

woke up at the hospital. Mr. Wilkerson had gunshot injuries to his left leg in the calf and his right leg under his knee. He was unable to walk for "about two and a half months." He did not know Defendant.

Joseph Mobley, who did not know Defendant, was at Studio X that night celebrating his birthday. He explained that he got "[t]urnt up" that night, partying and having fun. He saw the victim at the bar that night. At some point, Mr. Mobley went outside to smoke a cigarette. He finished his cigarette and was still outside talking when his "girl was telling [him] to come in." He turned around to go back inside when he heard gunshots. He tried to run but "couldn't get in unless [he] went through the door." He was shot in the back of the leg and fell as he got inside the club. He was taken to the hospital where doctors removed the bullet from his calf muscle. He was on crutches for about a month and a half after the incident.

Nancy Lawson was also injured by a gunshot that night. She saw the victim sitting at a table outside the club. She knew him as "Scooter." Just prior to the gunshots, Ms. Lawson walked outside the club to smoke a cigarette. Ms. Lawson saw Defendant standing outside the gate. She saw Defendant hug two girls and then "pull[] the pistol up and start[] shooting." The victim pushed Ms. Lawson and her friends toward the club. Ms. Lawson turned around to run and "felt something hit [her] foot." She also felt the victim fall on top of her. She was unable to get up for about ten minutes because the victim was on top of her. She never saw the victim with a gun. She thought there was glass in her foot "because everybody had been dropping their bottles" but when she looked at her foot, there was a bullet in her foot. She was in the hospital for four to five days and now has a "full metal" ankle.

Defendant testified at trial. He stipulated that he had a prior felony drug conviction. He testified that in June of 2014, he went to a club in Knoxville called Déjà Vu with his wife[2], Sparkle Jones, and three of his wife's cousins "simply to dance, [and] have drinks." He explained that the group was standing at the back of the club when a "very intoxicated lady" walked by and spilled her drink and his drink "all over [his] shirt." Defendant said, "Damn, baby" to the woman. The woman "[flew] off the handle" and put her finger in Defendant's face. Defendant told the woman, "okay Baby, you ain't got to put your hand in my face." Defendant took the woman's hand and moved it out of his face. The woman ran across the bar to a large man, telling him that "we got one to go." Defendant thought that the woman was talking to security but later identified the man as the victim. Defendant walked toward the woman "trying" to "[c]alm her down." Defendant planned to offer to buy the woman a drink, but the woman "smack[ed]"

---

[2] Defendant admitted that he and Ms. Jones were not married but that they had three children and referred to each other as husband and wife.

Defendant. Then, the victim, who Defendant described as the "enormous guy that [the woman] was with" hit him twice. Defendant fell to his knees with his hands on the floor. The victim grabbed Defendant by the back of the shirt and "uppercut" him in the face a few times. Defendant fell flat on his stomach and felt "different punches and kicks" on his body from a few people.

Defendant's wife's brother tried to help but was "bogarted, pushed out [of] the way." The women with Defendant tried to help but they got "smacked and pushed" by the men who accompanied the victim. Defendant's wife tried to help, but she was "coldcock[ed]" by the victim. Security eventually stopped the fighting. According to Defendant, the victim yelled at him, "you dead. You dead in this town. Every time I - - when I see you - - when I catch you, I'm going to kill you. You dead in this town. You don't never disrespect my wife." Defendant left the club but did not report the incident to the police.

As a result of the victim's threats, Defendant took his family, including his three children, to stay at his mother-in-law's house for about a week and a half. Defendant and his wife looked up Defendant on the internet to find out more information about him. Defendant explained that his family and friends came to him to tell him that the victim was "a very treacherous man" who had "no regard for human . . . life." As a result of what he learned about the victim, Defendant looked for a new place for his family to live. The family traveled to Detroit for a family reunion and stayed for about a week, partially to "let this situation breathe." Defendant was "scared" and "in a great deal of fear" for his life and for the lives of his family. Defendant talked to a friend while he was in Michigan and bought a gun to protect him and his family even though he was a convicted felon. Defendant admitted that he never reported Mr. Boatright's threats to the police. At trial, Defendant identified Mr. Boatright in a picture in which Mr. Boatright was depicted "[t]hrowing up gang signs."

When Defendant returned to Knoxville, he took the gun everywhere because he was "scared" of the victim. Defendant learned that the victim had put "an SOS" on his head. Defendant explained that an SOS was a "smash on sight."

Defendant's wife convinced him to go to Studio X to celebrate her cousin's birthday. Defendant took the gun with him. Defendant had a "great time that night." He did not see the victim at the bar. "[T]owards the end of the night" he noticed "some of the guys that was at [Déjà vu]." They were wearing white shirts. Defendant told his wife it was time to go, briefly explaining the situation. They started to leave; Defendant had his arm hooked through his wife's arm because she was "tipsy." As Defendant was walking out the door he saw the victim "looking dead at [him]." Defendant thought that "[t]hese guys [were] about to try to do something" to him. He heard one of the men say,

"here the bitch ass dude right here." When Defendant got about two feet away, the victim asked Defendant, "[d]idn't I tell your bitch ass I was going to kill you?" Defendant explained to the victim that Defendant was there with his wife and that he did not have a problem with the victim. Defendant testified that the victim said, "F*** your girl. She can get it too. I'll drop your bitch ass where you stand." Defendant saw the victim "come[] from behind his back" and saw "two or three guys coming [his] way." The moment the victim moved his hands from behind his back, Defendant shot him. Defendant thought the victim "had a gun or some type of weapon." Defendant explained that he was "scared" and "just reacted" pulling the trigger as fast as he could. Defendant and his wife took off running. His wife fell. Defendant helped her up and kept running. He threw the pistol down, heard police, and "got scared." Defendant was then arrested.

Detective Thomas Walker was called to testify as an expert in gang identification. He explained that the city of Knoxville started tracking gang activity in 1996 after the death of a five-year old girl. Detective Walker explained that there were several subsets of the the Crips gang, including "original Gangster Crips, the Kitchen Crips, 52 Hoover Crips, Rollins 60s, Rollins 20s, Rollin 40 Crips . . . 111 Neighborhood Crips" and others. Crips typically used the color blue to identify themselves as gang members. A different gang, Bloods, used the color red. Gang members "purposely do not wear rival gang colors." Detective Walker identified the victim as a high-ranking "OG" Crip member who went through a "gang removal program while in TDOC" incarceration in 2006-07.

Richard Qulia, a self-employed polygraph examiner and retired FBI agent, testified as an expert in the use of lethal force and as a firearms expert. According to Mr. Qulia, a person with his hands behind is back is "unacceptable" in law enforcement because it is "very dangerous." Mr. Qulia explained that when a person gets "into the fight-or-flight syndrome, they lose their fine motor skills."

Mr. Qulia reviewed the video surveillance of the shooting. He opined that one of the men in a white shirt was walking with one arm pointed downward and looked as if the man was "carrying something that ha[d] the same features as a semi-automatic pistol." Mr. Qulia admitted that he did not interview Defendant, did not go to the crime scene, and did not review the crime scene photographs prior to his testimony.

Paul Flanders, an employee of the Tennessee Department of Correction, explained that as part of his job he worked on "identifying gang members in the prison system and then gathering intelligence on them." He explained the victim had "several identifiers" signaling that he was in a gang. While incarcerated, the victim admitted that he became a member of the Crips when he was fourteen, had "Security Threat Group (STG) tattoos", associated with other Crips gang members, and had an "STG-related disciplinary."

Tim Adams testified that he was the Executive Director for the Wesley House Community Center in Knoxville, an inner-city program that provides after-school care and summer program for children in the urban areas of Knoxville. During the early summer of 2014, the victim paid the fees for one of his grandchildren in the summer program. He also routinely picked this child up from the program at the end of the day.

Ryan Mays, the warehouse manager from All Occasions Party Rentals, testified that the victim worked for him in the warehouse from May 23, 2013, to July 25, 2014. The victim worked full time, approximately 60 to 80 hours per week.

The victim's fiancé, Melody McAllister testified that the victim acted as a grandfather to her grandchildren, even paying the fees for a summer program for one of the children. She was with the victim at Déjà vu on the night in June of 2014. She explained that they were about to have a "Stripper Bowl Party" at the club. She walked past Defendant, who she thought was "tore up" on some kind of drugs. Defendant "bumper [her] real hard and smashed his whole drink on [her]." Defendant pushed her and cussed at her. She called out to the victim to tell him that Defendant was "practically" beating her up. The victim ran over and "started fighting" with Defendant. "Three women came from out of nowhere and jumped all on [her]." Ms. McAllister's tooth was knocked out in the fight. She did not see anyone "gang" on Defendant.

Ms. McAllister recalled the night that the victim was killed. She had gotten home from work in time to see the victim leave. Ms. McAllister did not see the victim with a gun that night and denied that the victim was in a gang.

At the conclusion of the jury trial, the jury found Defendant guilty of unlawful possession of a handgun, the lesser-included offense of second degree murder for the death of the victim, and five counts of attempted reckless endangerment for the shooting of the bystanders. Defendant was found not guilty of four counts of employing a firearm during the commission of a dangerous felony, and the State dismissed four counts of employing a firearm during the commission of a dangerous felony after having been convicted of a dangerous felony. Defendant received an effective sentence of thirty years in incarceration to be served at 100%. After Defendant filed a petition for post-conviction relief, the trial court granted a delayed appeal. Defendant filed a motion for new trial, and the trial court denied the motion.

*Analysis*

On appeal, Defendant argues that the evidence was insufficient to support the convictions. Specifically, Defendant argues that his "beliefs and acts were quite reasonable under the circumstances" and that the State could not "prove beyond a

reasonable doubt or to a moral certainty that [Defendant] did not act in self-defense." Further, Defendant argues that "the trial court committed clear error in accepting and approving the jury verdicts" because there "was not sufficient proof that would allow a rational jury to come to any conclusion except that Defendant had legally engaged in self-defense." The State counters that it was the "jury's prerogative to reject [Defendant's] assertions."

When a defendant challenges the sufficiency of the evidence, this Court is obliged to review that claim according to certain well-settled principles. A guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). The burden is then shifted to the defendant on appeal to demonstrate why the evidence is insufficient to support the conviction. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The relevant question the reviewing court must answer is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. *See* Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). On appeal, "the State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom." *State v. Elkins*, 102 S.W.3d 578, 581 (Tenn. 2003). As such, this Court is precluded from re-weighing or reconsidering the evidence when evaluating the convicting proof. *State v. Morgan*, 929 S.W.2d 380, 383 (Tenn. Crim. App. 1996); *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Moreover, we may not substitute our own "inferences for those drawn by the trier of fact from circumstantial evidence." *Matthews*, 805 S.W.2d at 779. Further, questions concerning the credibility of the witnesses and the weight and value to be given to evidence, as well as all factual issues raised by such evidence, are resolved by the trier of fact and not the appellate courts. *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In relevant part, second-degree murder is a "knowing killing of another." T.C.A. § 39-13-210(a). "A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." T.C.A. § 39-11-106(a)(22). With regard to self-defense, Tennessee Code Annotated section 39-11-611(b)(2) provides:

> Notwithstanding § 39-17-1322, a person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force intended or likely to cause death or serious bodily injury, if:

- 8 -

(A)    The person has a reasonable belief that there is an imminent danger of death or serious bodily injury;

(B)    The danger creating the belief of imminent death or serious bodily injury is real, or honestly believed to be real at the time; and

(C)    The belief of danger is founded upon reasonable grounds.

Tennessee Code Annotated section 39-17-1322 establishes that a "person shall not be charged with or convicted of a violation under this part if the person possessed, displayed, or employed a handgun in justifiable self-defense. . . ." Defendant was also convicted of a violation of Tennessee Code Annotated section 39-17-1307 which prohibits unlawful possession of a weapon after being convicted of a felony drug offense.

A defendant can use the defense of self-defense when there is a "genuine, well-founded fear that [the defendant] was in danger of death or great bodily harm[.]" *State v. Ivy*, 868 S.W.2d 724, 272 (Tenn. Crim. App. 1993). "[I]n the context of judicial review of the jury verdict, in order to prevail, the defendant must show that the evidence relative to justification, such as self-defense, raises, as a matter of law, a reasonable doubt as to his conduct being criminal." *State v. Clifton*, 880 S.W.2d 737, 743 (Tenn. Crim. App. 1994). The State has the burden of negating a defendant's claim of self-defense in the event that "admissible evidence is introduced supporting the defense." T.C.A. § 39-11-201(a)(3); *State v. Sims*, 45 S.W.3d 1, 10 (Tenn. 2001) (citing *State v. Belser*, 945 S.W.2d 776, 782 (Tenn. Crim. App. 1996)).

The State, citing *State v. Perrier*, 536 S.W.3d 388, 404 (Tenn. 2017), argues that because Defendant was a felon in possession of a firearm, he had a duty to retreat. The State argues that Defendant can only assert self-defense if Defendant "employed all means in his power, consistent with his own safety, to avoid danger and avert the necessity of taking another's life." *Id.* While "new rules apply retroactively to cases pending on direct review," Defendant's trial took place in 2015 and *Perrier* was not filed until 2017. *State v. Minor*, 546 S.W.3d 59, 68 (Tenn. 2018). Thus, *Perrier* does not apply.

Viewing the evidence in a light most favorable to the State, the proof at trial showed that Defendant and the victim had a history of confrontation that occurred prior to the victim's death. While Defendant claimed that he felt threatened by Defendant, he readily admitted that he never reported the victim's threats to the police. The surveillance video, viewed by the jury, showed Defendant near the sidewalk outside the club when he started shooting the victim. There were no witnesses that testified the victim made any threats, verbal or otherwise, toward Defendant. Moreover, the surveillance video does not show the victim in the possession of a weapon, and the only weapon found near the scene was the Glock which contained Defendant's DNA. The

shots fired at the scene were determined to have come from the Glock. The jury heard the testimony, resolved any questions concerning the credibility of the witnesses, weighed the evidence, and determined that the evidence was sufficient to support the conviction for second degree murder and unlawful possession of a handgun. *See Pruett*, 788 S.W.2d at 561. Defendant is not entitled to relief with respect to his convictions for second degree murder and unlawful possession of a handgun.

With respect to Defendant's convictions for attempted reckless endangerment, however, we are compelled to examine whether Defendant was convicted of a crime that does not exist in our jurisdiction. Even though Defendant has not raised this issue on appeal, we review these convictions pursuant to Rule 13(b) of the Tennessee Rules of Appellate Procedure which provides that the court may consider issues not presented for review "in its discretion . . . among other reasons" in order to "(1) prevent needless litigation, (2) to prevent injury to the interests of the public, and (3) to prevent prejudice to the judicial process."

A person commits criminal attempt when he or she, "acting with the kind of culpability otherwise required for the offense," engages in one of the following activities:

> (1) Intentionally engages in action or causes a result that would constitute an offense if the circumstances surrounding the conduct were as the person believed them to be;
> (2) Acts with intent to cause a result that is an element of the offense if the circumstances surrounding the conduct were as the person believed them to be; or
> (3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

T.C.A. § 39-12-101(a). Reckless endangerment is committed when a person "recklessly engages in conduct that places or may place another person in imminent danger of death or serious bodily injury." T.C.A. § 39-13-103(a). Reckless endangerment is a Class A misdemeanor or a Class E felony when committed with a deadly weapon. T.C.A. § 39-13-103(b)(1) & (2). A person acts recklessly "with respect to circumstances surrounding the conduct or the result of the conduct when the person is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur." T.C.A. § 39-11-302. The "risk" referred to in the definition of recklessly "must be of such a nature and degree that its disregard constitutes a gross deviation from

the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint." *Id.*

In *State v. Kimbrough*, 924 S.W.2d 888, 892 (Tenn. 1996), our supreme court examined the application of the criminal attempt statute in the context of an attempted felony murder charge. The court pointed out the fact that the criminal attempt statute requires that the accused intend to commit an offense while felony murder does not require a culpable mental state. *Id.* The Tennessee Supreme Court concluded that "a charge of 'attempted felony murder' is inherently inconsistent, in that it requires that the actor have intended to commit what is deemed an unintentional act." *Id.* The court commented "that it is logically and legally impossible to attempt to perpetrate an unintentional killing." After the release of *Kimbrough*, this Court determined that attempted reckless homicide did not constitute a crime because "an attempted reckless homicide would indeed require the actor to intend to commit an unintentional act; therefore, it is not a recognized crime in Tennessee." *State v. Vernon Lamar Bryant*, No. E2002-012340-CCA-R3-CD, 2003 WL 22398460, at *2 (Tenn. Crim. App. Oct. 21, 2003), *perm. app. denied* (Tenn. Mar. 22, 2004); *see also State v. Kenneth Anthony Henderson*, No. M1999-00547-CCA-R3-CD, 2002 WL 537042, at *5 n.3 (Tenn. Crim. App. Apr. 11, 2002) (observing that attempted reckless homicide is not a lesser included offense of attempted first degree murder because it does not exist as an offense in Tennessee), *no perm. app. filed*; *State v. John Mark Burns*, No. W2003-01464-CCA-R3-CD, 2004 WL 2108236, at *6 (Tenn. Crim. App. Sept. 21, 2004) (determining that attempted criminally negligent homicide is not a recognized crime), *no perm. app. filed*.

In order to find Defendant guilty of an attempt crime, Defendant must have had the specific intent to commit the underlying offense. *See* T.C.A. § 39-12-101(a). Here, Defendant would have had to have the intent to act recklessly. At least one panel of this Court has expressed "serious concerns about the legitimacy of a conviction for attempted reckless endangerment," but ultimately did not discern whether it was an offense because the conviction was merged into an aggravated assault conviction. *See State v. Willie Nolan*, No. W2014-00990-CCA-R3-CD, 2015 WL 5838739, at *1 n.1 (Tenn. Crim. App. Oct. 7, 2015) (citing *Kimbrough* to question whether attempted reckless endangerment is an offense). Here, Defendant's convictions for attempted reckless endangerment did not merge with another conviction. In our view, as the *Kimbrough* court explained, "one cannot intend to accomplish the unintended." 924 S.W.2d at 892. Consequently, Defendant was convicted of a crime which does not exist and the convictions are void. Defendant's convictions for attempted reckless endangerment must be vacated and the case dismissed.

*Conclusion*

- 11 -

For the foregoing reasons, the judgments of the trial court are affirmed with respect to Defendant's convictions for possession of a firearm by a convicted felon and second degree murder. Defendant's remaining convictions for attempted reckless endangerment are vacated and dismissed and the case is remanded to the trial court for further proceedings consistent with this opinion.

_____
TIMOTHY L. EASTER, JUDGE